[Cite as *State v. McFarland*, 2013-Ohio-2019.]

IN THE COURT OF APPEALS FOR MONTGOMERY COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| Plaintiff-Appellee | : | C.A. CASE NO.   24418 |
| v. | : | T.C. NO.   08CR4486 |
| ALFRED D. McFARLAND | : | (Criminal appeal from Common Pleas Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . .

**O P I N I O N**

Rendered on the ___17th___ day of ___May___, 2013.

. . . . . . . . . .

KIRSTEN A. BRANDT, Atty. Reg. No. 0070162, Assistant Prosecuting Attorney, 301 W. Third Street, 5th Floor, Dayton, Ohio 45422
          Attorney for Plaintiff-Appellee

R. JASON HOWARD, Atty. Reg. No. 0074662, 4130 Lindon Avenue, Claypool Bldg., Suite 304, Dayton, Ohio 45432
          Attorney for Defendant-Appellant

. . . . . . . . . .

DONOVAN, J.

{¶ 1}    Defendant-appellant Alfred D. McFarland appeals a decision of the

Montgomery County Court of Common Pleas, Criminal Division, overruling his motion to withdraw his no contest pleas to one count of rape, in violation of R.C. 2907.02(A)(2), a felony of the first degree, and one count of gross sexual imposition (GSI), in violation of R.C. 2907.05(A)(4), a felony of the third degree. McFarland filed a timely notice of appeal with this Court on January 4, 2011.

{¶ 2} We set forth the history of the case in *State v. McFarland*, 2d Dist. Montgomery No. 23411, 2010-Ohio-2395 (hereinafter *McFarland I*) and repeat it herein in pertinent part:

Detective Phillip Olinger of the Special Assault Unit of the Dayton Police Department was the State's sole witness at the suppression hearing. His testimony established the following facts:

On November 17, 2008, Detective Olinger was called to McFarland's residence in Dayton on a report that McFarland, who was 52 years old, had raped his nine-year-old step-daughter. When Olinger arrived at the residence, several other officers were already present and McFarland was standing on the porch. Olinger had met McFarland a couple of months before during a theft investigation. Olinger asked McFarland if they could go into the residence and talk privately. McFarland agreed, and the two went into the kitchen. Olinger advised McFarland of the allegation and asked for consent to search the house. McFarland gave his permission. Olinger read a consent to search form to McFarland; McFarland indicated that he understood the form and signed it. Olinger did not see any indication that

McFarland was under the influence of drugs or alcohol.

After McFarland gave consent to search the house, Olinger asked McFarland if he could interview him (McFarland) at the police station. McFarland agreed. Olinger had another officer transport McFarland to the detective section of the police station located at 335 West Third Street. Olinger testified that McFarland "consensually went with the police" and he was not under arrest. Olinger stayed at the residence and obtained information from other officers and family members who were there.

When Olinger arrived at the police station, he greeted McFarland in an interview room, shook his hand, asked him if he needed anything to eat or drink and if he needed to use the bathroom or the telephone, and provided him with a cup of water. Olinger did not have a weapon when he went into the room. Olinger asked McFarland about his education and if he could read and write. McFarland responded that he had an eighth grade education and could read and write, but not very well. Because of McFarland's answer, Olinger went "a little slower" to make sure that McFarland understood everything. McFarland also said that he had a driver's license.

Olinger reviewed McFarland's constitutional rights with him using a pre-interview form. The interview form was dated November 17, 2008, at 6:40 p.m. Olinger advised McFarland that he was being interviewed regarding the crime of rape, and the detective wrote "rape" on the form. Olinger then read each of the rights to McFarland; McFarland indicated that

he understood his rights. McFarland initialed each of the rights, wrote in his years of education, and signed the form. Olinger also signed the form. Olinger stated that he spent five to ten minutes reviewing the form with McFarland.

McFarland was cooperative during the interview and did not ask to stop the interview. At several points, Olinger left the interview room to gather additional information; one break lasted approximately 40 minutes. Every time Olinger left, he asked if McFarland needed anything, and upon returning, Olinger always asked if the interview could continue; McFarland stated that it could. Olinger checked on McFarland several times.

Toward the end of the interview, Olinger asked McFarland if he would make a written statement. McFarland declined. Olinger asked McFarland if he would write answers if the detective wrote out a couple of questions. McFarland agreed. Olinger left the room and wrote four questions. Upon returning, he asked McFarland if he could read the questions; McFarland indicated that he could read the detective's writing. McFarland told Olinger the answers, wrote the answers ("yes" or "no"), initialed by his answers, and signed the paper. At the conclusion of the interview, Olinger took a saliva DNA sample from McFarland.

Olinger denied that he had made any threats or promises to McFarland during the interview. Olinger further stated that a female officer who had briefly entered the room also did not coerce McFarland in any way. Olinger

acknowledged that he told McFarland that he did not believe McFarland and that McFarland needed to "tell [him] the truth." The entire interview lasted for approximately 95 minutes, including breaks totaling about 50 minutes. The interview was not recorded. It is unclear whether McFarland was arrested at the conclusion of the interview.

McFarland also testified at the suppression hearing. He testified that he cannot read or write, and can only spell his name. McFarland agreed that Olinger left the room three or four times. He testified, however, that Olinger would return, saying, for example, "You need to answer me some questions, because my boss, he's much meaner than me." McFarland denied that he had written the answers to questions on the sheet of paper.

On cross-examination, McFarland agreed that he had signed a consent to search form at his house, saying "they was going to get a search warrant anyway. I didn't have nothing to hide." He acknowledged that Olinger read the consent and pre-interview forms to him and that he understands when someone reads something to him. McFarland also conceded that he had paid attention to Olinger when the detective reviewed his rights with him and that he had initialed and signed the form. Upon questioning by the court, McFarland clarified that the detective had read his rights at the beginning of the interview, but said he did not initial or sign the pre-interview form until the end of the interview. McFarland stated that he was not under the influence of drugs or alcohol and that Olinger offered water and an

opportunity to use the bathroom. He believed that the interview had lasted approximately one and one-half hours. McFarland stated that he had told Olinger, at some point during the interview, that he wanted the interview to stop.

In December 2008, McFarland moved to suppress the statements that he gave to the police, arguing that he did not knowingly, intelligently, and voluntarily waive his rights under *Miranda v. Arizona* (1966), 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, and that his statements were obtained as a result of coercion by Olinger. A hearing on the motion was held on January 23, 2009.

At the conclusion of the hearing, the court orally overruled the motion. The court found that, even taking into account McFarland's "difficulty with reading and writing, *** [i]t did not appear to the Court that the Defendant has any kind of mental or intelligence deficiency other than the ability to read and write. *** And I find that based on the weight of the evidence that the Defendant was advised of his *Miranda* rights, that they were read to him, and that he did make a waiver of those rights. And it's clear to the Court that the Defendant understood those rights. ***" The trial court further found that the interview itself was not "in any way oppressive." The court did not consider statements by the detective such as "my boss doesn't believe you" to constitute the type of threats that would cause McFarland to make involuntary statements. An entry overruling the motion to suppress

was filed on January 26, 2009.

In March 2009, McFarland pled no contest to one count of rape and one count of gross sexual imposition. Eleven other counts were dismissed.[1] The court sentenced him accordingly.

{¶ 3}    On appeal, McFarland argued that the trial court erred when it overruled his motion to suppress. McFarland also asserted that he received ineffective assistance of counsel. We affirmed his conviction and sentence in *McFarland I* issued on May 28, 2010. On September 22, 2010, McFarland filed a motion to withdraw his pleas. The trial court overruled McFarland's motion to withdraw in a decision issued on December 7, 2010. McFarland's appellate counsel filed an *Anders* brief in which he alleged there were no meritorious issues for review. McFarland filed a pro se appellant brief on January 13, 2012, in which he reiterated his claims of ineffective assistance of counsel. In an entry issued on June 1, 2012, we found that one of his assigned errors had arguable merit and appointed new counsel to represent him.

{¶ 4}    In the instant appeal, McFarland contends that the trial court erred because it failed to conduct a plea colloquy that substantially complied with Crim.R. 11. Specifically, McFarland argues that the record establishes that the trial court failed to determine that he waived his rights knowingly and voluntarily during the plea colloquy. In his second and final assignment, McFarland argues that the he suffered a manifest injustice pursuant to Crim. R. 32.1 when he pled no contest under duress because of ineffective assistance of

---

[1]In exchange for the plea, the State dismissed one count of rape of a child under the age of thirteen, three counts of gross sexual imposition of a child less than thirteen, three counts of attempted rape of child less than thirteen, two counts of importuning, and two counts of public indecency.

counsel.

{¶ 5}     Because they are interrelated, McFarland's assignments of error will be discussed together as follows:

{¶ 6}     "THE LOWER COURT FAILED TO CONDUCT A PLEA COLLOQUY THAT SUBSTANTIALLY COMPLIED WITH CRIMINAL RULE 11."

{¶ 7}     "THE COURT SHOULD PERMIT MCFARLAND TO WITHDRAW HIS NO CONTEST PLEA TO CORRECT A MANIFEST INJUSTICE."

{¶ 8}     Initially, we note that in *State ex rel. Special Prosecutors v. Judges, Court of Common Pleas*, 55 Ohio St.2d 94, 97-98, 378 N.E.2d 162 (1978), the Ohio Supreme Court stated as follows:

> [T]he trial court does retain jurisdiction over issues not inconsistent with that of the appellate court to review, affirm, modify, or reverse the appealed judgment, such as the collateral issues like contempt, appointment of a receiver and injunction.  However, *** [when] the trial court's granting of the motion to withdraw the guilty plea and the order to proceed with a new trial [are] inconsistent with the judgment of the Court of Appeals affirming the trial court's conviction premised upon the guilty plea, [t]he judgment of the reviewing court is controlling upon the lower court as to all matters within the compass of the judgment.

{¶ 9} Accordingly, the trial court loses its jurisdiction when an appeal is taken, and absent a remand, the trial court does not regain jurisdiction subsequent to the decision of the court of appeals. *Id*. at 97, 378 N.E.2d 162.  "Furthermore, Crim.R. 32.1 does not vest

jurisdiction in the trial court to maintain and determine a motion to withdraw the guilty plea subsequent to an appeal and an affirmance by the appellate court." *Id*.

**{¶ 10}** In the instant case, McFarland pled no contest to rape and GSI on March 12, 2009. The trial court accepted the plea, found McFarland guilty, and sentenced him on April 9, 2009. When McFarland's conviction and sentence were affirmed by this Court in its opinion issued May 28, 2010, the trial court subsequently lost jurisdiction to consider a motion to withdraw his no contest plea. As in *Special Prosecutors*, the trial court lacked jurisdiction to consider McFarland's motion to withdraw his no contest plea which was filed on September 22, 2010, approximately four months after we issued *McFarland I* in which we affirmed his conviction and sentence on direct appeal. *State v. Jackson*, 2d Dist. Miami No. 2000-CA-48, 2001 WL 303225 (March 30, 2001).

**{¶ 11}** Significantly, in our prior decision affirming McFarland's conviction and sentence, we did not remand the case to the trial court. Instead, we simply affirmed the conviction. Accordingly, under controlling authority, the trial court had no jurisdiction to entertain McFarland's motion to withdraw. As indicated by the Ohio Supreme Court, granting a motion to withdraw would be inconsistent with our decision affirming the conviction.

**{¶ 12}** Based on the above analysis, the first and second assignments of error are overruled.

**{¶ 13}** All of McFarland's assignments of error having been overruled, the judgment of the trial court is affirmed.

. . . . . . . . . .

[Cite as *State v. McFarland*, 2013-Ohio-2019.]
FAIN, P.J. and WELBAUM, J., concur.


Copies mailed to:

Kirsten A. Brandt
R. Jason Howard
Hon. Mary Katherine Huffman